17-1154 Marquette County Road Commission v. EPA et al. Oral Argument, 15 minutes per side. Mr. Miller for the appellant. May it please the Court, I am Mark Miller and I represent the appellant Marquette County Road Commission in this case. Your Honors, I'd like to reserve three minutes of my time for rebuttal and note that I rely on the briefs for any point of law we don't discuss here today. Your Honors, this is an administrative law challenge to the EPA's veto of a state-approved permit under Section 404 of the Clean Water Act. The lower court held that the veto did not amount to final agency action subject to court review under the Administrative Procedure Act, but the lower court was wrong. This court should reverse the lower court's decision to dismiss the complaint and remand for the government to answer the complaint. Why was the lower court wrong? Well, Section 704 of the Administrative Procedure Act tells us so. Section 704 says that final agency action for which no other adequate remedy exists is reviewable in court, and that's what we have here. This court in Berry v. Department of Labor said last summer that there's a litmus test that the Supreme Court in U.S. Army Corps of Engineers v. Hawks identified that basically applies Bennett v. Speer, the two prongs of Bennett v. Speer, to show final agency action that's reviewable in court. One, that the agency action is consummated. Here, Your Honors, I would submit that there's no question the EPA's role as to the 404 permit that the Michigan Department of Environmental Quality wanted to issue was consummated. It vetoed the DEQ, which wanted to issue the permit. It gave reasons, reasons that were beyond its powers, and at that point, when 30 days elapsed because the DEQ could not satisfy the arbitrary and capricious reasons that the EPA had given for vetoing the permit, by law, the permit process transferred to the Corps, and the Corps demanded, this is an important fact, it demanded a new permit. It did not say, we're now going to review the ongoing permit process that the DEQ was undergoing. Instead, it said, we want you to submit a new permit, and this new permit was going to have a whole number of factors, a host of factors that were different than what the DEQ looked at. We know that the EPA, and let me give you very quickly the reasons why that permit were different. For example, as I said, the Corps demanded a new application. To apply for the permit with the Corps, there were going to be different definitional terms that applied. The process would require, I think this is probably the most significant difference, the Market County Road Commission was going to have to comply with NEPA. That's a significant difference from the application it had gone through with the DEQ. There are different public interest factors and mitigation ratios, and the federal process was going to require a tribal consultation. And lastly, there would be a new interagency public and agency comment period. So these were all significant differences between the DEQ permit that had been vetoed and was done. It was gone. It would never be resurrected because the EPA vetoed it. We know from Friends of Crystal River that EPA's role as to that DEQ permit was done. It was consummated. The EPA could not come back and reverse itself. Once the process transferred to the Corps, the EPA could not get back involved. In Friends of Crystal River, of course, EPA wanted to reverse its veto, and this Court said, no, you can't, your role is done here, the process now moves on. But that shows you why the first prong of Bennett v. Speer is met. The second prong is that rights were determined, obligations were determined, where obligations and legal consequences flow. And I would suggest that we have all three of those things. Do we have a final action? Did the veto impose legal obligations? Yes, the county now had to apply for the Army Corps of Engineers permit, or it would just have to not build the road, which is effectively what happened. Tell me, you keep saying that the EPA vetoed the application for the permit. What do you mean by that? Well, Your Honor, the EPA said, DEQ, yes, you're ready. In September 2012, the DEQ says to EPA, we're ready to issue the permit. They have satisfied what the Clean Water Act tells us we have to do in order to issue a permit. We think this is proper. We want to issue the permit. EPA had already once nixed a permit that the DEQ was ready to issue, and now they were doing it again. The reasons they gave when they vetoed it in early December of 2012 were arbitrary and capricious. We're here on a motion to dismiss standard, and we've alleged in the complaint that the rationales given were arbitrary and capricious. So are you suggesting that we have to take that as you present it? Why isn't that a legal conclusion? Well, Your Honor, that's a legal conclusion, but what we know is from the veto, from the determination that the EPA made that they were going to object to the DEQ permit, they gave reasons, and those reasons were factually outside of its powers. That would sort of lead into the second argument, but they were getting into decisions that Congress had vested in the state DEQ. Part of the Clean Water Act, certainly part of the mission that Congress set up, was for cooperative federalism. It would make a mockery of the process, or a farce, as this court said in Ford Motor Company, if the EPA could just sit in with carte blanche authority and veto, or in this case reject, any decision that the state wants to make as to what's best for the state's waters. And here, the state had made that decision, had followed the law, but the EPA had said, no, you're not going to do that. The DEQ and the road commission went back to the EPA in December of 2012 and said, what can we do to fix this? And the EPA said, did not give them any response. The EPA told the road commission, go talk to the DEQ. The DEQ throws its hands up, the 30 days expires, and we see in January 2013 an EPA official saying, all's well that ends well. Because really that's what the EPA saw here. When we talk about the facts, I think this case is mostly about the law, but when we talk about the facts, the facts are embarrassing for the EPA. From the get-go, as the brief sets out and as the complaint set out, the EPA and the Army Corps of Engineers set out to deny this permit, to build this road that was good for the people of the upper peninsula of Michigan. And so we see in January 2013, the agency thinks, this is over. And why do they think it's over? Because the DEQ permit is done. It can never be brought back. If we were to go forward with the Corps, the government's going to make the position, no, instead it's a continuing process. Number one, it's not continuing because it's a different permit. But number two, like the compliance order in SACIT, you can't go back and review the reasons that were given for denying the DEQ permit, for vetoing the DEQ permit. We're going to have a new permit with the Corps, and if the Corps doesn't issue the permit, no question, the road commission can appeal that. Under your reasoning, it seems to me that you would be saying that what you're really objecting to is the setup that says if the EPA doesn't, within the time frame, approve it, it goes to the Corps, and under your line of reasoning, every time that happens that would make the EPA's action final. If the EPA were to object in an arbitrary and capricious way to a state-approved permit, as it did here, then yes, the courthouse doors open, just like with any compliance order. The facts of SACIT, for example, were particularly egregious, but the Supreme Court didn't focus on the facts because it was a question of law. Every compliance order going forward after SACIT because of the pragmatic approach the courts are supposed to take to Section 704 in finding final agency action, every compliance order is now reviewable. Every appellate court that had reviewed it, every federal court that had reviewed that question before we got to SACIT, there was no circuit split. Everyone had said, not reviewable. The Supreme Court said, nine to nothing. Yes, it is. Then we get to Hawks. The Corps of Engineers comes in and says, this process is ongoing. Yes, we gave a JED, an affirmative jurisdictional determination, that says they have to apply for a permit, but the process is ongoing. And after they apply for the permit, if we deny it, they can then appeal the question as to whether the property ever had federal wetlands in the first place. And the Supreme Court said, again, unanimously, eight to nothing. No, no, no, no, no. The JED is final agency action where the Corps' decision as to whether there's wetlands here, federal wetlands, waters of the United States, is a final decision. If we had a negative JED, then the property owner, in that case Hawks Company, would have been able to go forward with their peat farming, their peat mining. And so that was the legal consequence. They couldn't do that. Their rights were fixed. Similarly here, if the EPA had properly approved the DEQ permit, then we'd already have this road in the upper peninsula of Michigan, but they didn't. So the flip side of it is, when they veto it, just like in Hawks, that's final agency action. And we can question why they vetoed that permit. Why would Congress have set up this process to only end up saying that the EPA can stall, can force you to spend, as we know from Rapanos, upwards of $270,000 to secure that Corps permit, another $270,000 we know from the complaint, upwards of half a million dollars, which is what the expert said from Marquette County it would cost. It's going to take years, again, as we know from Rapanos. Why would Congress have set this up? I anticipate that the government is going to say, as I said in its briefs, that this should be looked at as no different than 402. But I would suggest that 402 is obviously different, factually, because there, when the EPA objects to this 402 permit that the state is ready to issue, the EPA takes over the case. So its actions are not consummated. It vetoes, and the permitting authority transfers to the EPA. It's the same agency. Here, it's not the same agency. When the EPA vetoed the state's decision to issue the permit, authority now transfers to the Corps. That's a different agency. Just the government in Sackett tried to argue that you could have challenged, that the landowners of the Sacketts could have challenged the compliance order at the end of the permitting process that they had to go through to see if they could ever fill their land and build their home. And Justice Kennedy in a concurrence said, no, no, no, no, no. You don't go to a separate agency to then circle back and challenge what the original agency did. And then, of course, in the majority opinion, they said, of course this is consummated final action because the agency's work is done. The fact that there was a continuing process administratively didn't mean the compliance order was not appealable then because there were consequences. There, they were looking at fines. And here, there are likewise consequences. We can't build the road. If they build the road without having secured the permit, for example, if they had just gotten the DEQ to give you the permit and then under the state law, then they're looking at the federal government coming down on them for building the road through federal wetlands without a 404 permit. So knowing my time is just about up, I will reserve for Roboto. I guess before you, does it make sense to look at this piecemeal as to the decision of the EPA and then the decision of the Corps? Does it further judicial economy to allow an appeal even when the process is only halfway through as set up by Congress? Does that further what we want? We don't want the efficiency of the state to trump all, to trump justice. And, in fact, we know what Congress wants. Efficiency of the court to trump justice? Well, I think the statute tells us. The statute has a two-step process, and you're at the one step, the EPA step, but they also have the Corps process. And what you want to do is say that you have a right to appeal halfway through even though the ultimate decision whether the road can be built or not hasn't been made because the Corps could approve it. Do you think Congress, that was their intent? Yes, I think, Your Honor, because we combined the Clean Water Act with 704 of the Administrative Procedure Act, which says final agency action. It doesn't say final government action. The agency's work, the EPA's work, is done. And so that tells us, just like in Hawk's Company, the agency said this is a continuing process. They might have gotten their permit too. The JD was a step in the process, according to the Corps, who I know is here today. But the Supreme Court said eight to nothing. No, no, no, no. Yes, it's a step in that particular process that's been designed, but the JD is a final decision as to whether there's federal wetlands. Similarly here, it's a final decision as to whether what Congress has designed for the state to issue, whether that was rightly vetoed. In Hawk's Company, after the case was remanded, the landowner was proven to be right, and the district court found it arbitrary and capricious what the Corps had done there in deciding it had jurisdiction over the Hawk's Company's property. And I would suggest to the court that if this court were to follow Hawk's and follow Sackett, we would reach the same conclusion on the merits. Do you also have an argument of futility? Is that right? Yes, Your Honor. What makes it – you keep using the word veto. Yes, Your Honor. But it was really objections, right? Your Honor, I think that's a distinction without a difference, because effectively here the EPA has twice said, no, DEQ, this permit you're ready to issue is not good enough for us. And the reasons the EPA was giving were not within its powers to give. Then the EPA knew it was taking advantage of the statute to say, well, now it's going to bounce to the Corps, and what the DEQ was ready to do is over. So as a question of futility, factually, I think as the complaint sets out, they were never going to get their permit, and they shouldn't have to go through a sham, through a farce exercise, with the Army Corps of Engineers, only to be told a couple of years later after they wasted hundreds of thousands of more dollars. Why is it a farce to go to the Corps? Because we know from the evidence, what's alleged in the complaint, that the Corps and the EPA had already decided all's well that ends well. They did not want a permit here from before. In the pre-application process, there was a meeting among the parties, not among Marquette County Road Commission. They were not invited, but the government said, we're not going to approve this road project. This was a well-known proposed road project from a mine to a mill, and the EPA and the Corps wanted none of it. So that's why it was futile, factually. That's an entirely different argument, though, from my agency Hawks and Sackett argument, and I will reserve the rest of my time. Thank you. Good morning. My name is Ellen Durkee. I represent the Environmental Protection Agency and the Corps of Engineers. The district court correctly held that the EPA objections are not finally agency action and reviewable under the Administrative Procedure Act. When it's here, the state does not actually deny or issue a permit, and the question of permit issuance has been left unanswered. Congress deliberately designed this scheme in 1977 in Section 402D and in Section 404J to make EPA objections an interlocutory step in the permit evaluation process so that when, as it happened here, the state does not make a decision within the statutory time frame that Congress provided, that does not render it a final decision. Instead, it's an interlocutory decision, and the process continues. Does the case rise and fall in whether we consider it two permits or one permit? They say that the permit for the EPA was, in effect, denied by the objection, and therefore they had to apply for a new permit to the Corps so that the final agency action is done as to the EPA permit, and the other one's a different permit, or do we look at this as one permit? Well, this is one permit because what they applied for, in relevant part, is a Section 404 dredge and fill permit. There is not something there. There can be a state permit for state law purposes, but for Section 404 purposes, there's only one permit. But it was so, though, that the Corps was demanding a whole new application. I'd like to clarify that. What the Corps asked them to do is to identify what the proposal was at that point. In this process, the permit application was revised multiple times. There were three revisions prior to the hearing. There were then more revisions than I necessarily can count after that. And so what the Corps was saying to them is, we're not sure what your proposal is at this point. Please, you know, give us some materials here. And they took the position that they would not give them any materials, that the Corps should simply know what the proposal is at that point. I mean, keep in mind that, I mean, what they've – so it's not a new application in the sense that – So they refused to even give the Corps all of the materials that they'd already submitted to the EPA? Is that what you're saying? Correct. And they also did not identify which of those various revisions that they wanted – you know, that they were now coming forward with. I mean, after the EPA objections in December of 2012, they did then try to talk to the state about conditions that would resolve that, and ultimately the state was unwilling or unable to, you know, complete that process. But they were then in a position that they could have gone to the Corps with those revisions as well. I mean, simply what happened is that they decided to abandon the process. You can't have a permit process where you don't have an applicant that wants to pursue it anymore, and that's essentially what happened here. The Corps stands ready today. If they will identify what the proposal and what they want – the documents that they want the Corps to consider as their application, the Corps would process that today. So this idea that it's somehow new because they actually have to – I mean, it's really a trivial difference. It's only new in the sense that you have to give them the papers that you want them to consider, you know, as part of their application. You can give them the same papers that were submitted to the EPA. You don't have to submit, I mean, new forms or anything. Right. You don't have to. Well, if you took all these papers, what you'd have are their proposal in June, their proposal in July, their proposal in October, their proposal in November, their proposal in, you know, different – twice in December. So what the Corps needs – I mean, you know, it certainly would not have been difficult for them just to provide those papers instead of making the Corps go find them. But really what's needed is they have to say to the – you know, identify for the Corps what is the proposal that they consider their application at this point. And will it cost them – when they do it, do they have to pay $270,000 with it? Well, you know, we're at a motion to dismiss stage. I don't know what the cost would be. What they have used is a figure that was mentioned of a secondary source as to what an average cost is. So I would – I mean, common sense would tell you that since they've done, you know, all this analysis already is that it wouldn't be like starting at ground, you know, with a permit that, you know, is at the first stage. But, you know, the cost – I mean, that's not – that shouldn't be the deciding factor here. Well, it would be if there weren't any money, but that's beside the point, I suppose. The Commission has also indicated, as I understand the argument, that the Corps was saying that there would have to be some entirely new requirements met beyond what the EPA was requiring. Do you say that that is not correct? Well, what they've identified – this isn't what, you know, what the Corps was saying to them. This is what they're identifying by comparing, you know, the regulations. But the factors that they're identifying are procedural aspects, really. I mean, the substantive criteria is not different. And what Mr. Miller just mentioned, he said, well, the definitional terms under the Michigan law and under the Corps are different, but they can't be different in terms of the federal jurisdiction. The state, when it is standing in the role of having been delegated permitting authority under the Clean Water Act, has to use the Clean Water Act jurisdictional provisions for the Clean Water Act aspect. A state is always free to impose additional requirements, and they may have a definition that encompasses other wetlands for state law purposes, but that's not the Clean Water Act definition that they can use. They mentioned that there are procedural factors such as consultations. These are things that a federal agency, the original permitting authority has to comply with, but those are procedural. NEPA is a procedural statute. And by the way, the state has a comparable statute. So the differences that they're trying to highlight, they also mentioned in their briefing, there's a different timeframe, but these are not substantive differences between the state and the Corps process. I mean, in both instances, they're supposed to be applying the Section 404B1 guidelines in determining whether those have been satisfied. I'd like to speak to this issue of this continued use of the word veto, because I think that that seems to be the critical characterization for the plaintiff's argument here. But a veto means that you cannot get a permit. In 404 itself, there's a distinction between what happens in 404J with EPA objections and a true veto. And, you know, in this case, the EPA objection gives the state opportunity to take action, and then when the state, as it did here, there's an impasse because they don't take an action within the statutory time, then it simply shifts the permitting authority. That is not a veto. The Corps may look at this and say, we think it's satisfactory. EPA, you know, they may come up with the provisions that they need to satisfy that, the objections, in which case they could still get a permit. And that's what they simply did was stop the process and decide not to continue. Now, true veto, like in the vernacular sense in 404C, it doesn't use the word veto, but it's always referred to that in the case law and generally. And that is, EPA does have the authority under 404C to decide that particular areas may not be used as a disposal site. In other words, there are particular areas that you cannot place fill in. And that becomes, you know, binding on the Corps. But that's not what's happening here, and there's been no, you know, decision making under 404C. Instead, it is simply looking at a permit evaluation process that Congress designed to continue. And the last thing I'd like to say is that as we explain our brief in pages 16 to 19, Section 404J does mirror Section 402D. And there are many cases, both before Hawks and Sackett, where the courts of appeals have held that EPA objections under the amended Section 402 that follows the same sort of process as 404J are not reviewable final agency action because there has not yet been an answer on the permit. The fact that it goes to EPA, you know, the original permitting authority is EPA, or the Corps is really neither here nor there. The question is, has there been a decision on the permit? There has not, and therefore this is not a final agency action that's ready for review. So why do you think this is different from Hawks? From what? Hawks. Well, in Hawks, through regulation, the EPA and the Corps had set up a process where landowners could get a jurisdictional determination, and it was a very intensive process, and they had a preliminary determination, they had a final determination. It was not contested that it met the first Bennett consummation factor. The question whether it had legal consequences. And the key element of that was that the Supreme Court interpreted a memorandum of understanding as binding the Corps and EPA to a negative jurisdictional determination, and that was really the cornerstone. Now, we don't have any of what I think the first difference is here. In this case, it's uncontested that they do need a 404 permit. It's uncontested that there are jurisdictional wetlands that would be filled under this proposal. So we don't have this sort of separation of is there jurisdiction under the Clean Water Act, meaning do you even need a permit, from the permit process itself. Here we're talking about the process that they initiated for a permit, and we still don't have an answer on that permit. In other words, you don't have sort of these different processes. And the other thing is that there really isn't this comparable binding impact that Hawks had. So I think they're trying to sort of pigeonhole everything into Hawks, but this really is a different statutory scheme under 404J than what the court was looking at in Hawks. Your Honor, I want to pick up with your last question. Why is this different from Hawks? I would say, if anything, it's worse than Hawks. One, there's no right to a jurisdictional determination according to the statute. According to the Clean Water Act, there's no right to a JD. That's just something the agency gives you the opportunity to ask for under the regulations. Here, on the other hand, Congress has designed a statute that sets it up so that states can take control of the permitting process. As I say, footnote 7, page 39 of my brief, ultimately the argument the EPA is making ignores that the Clean Water Act says that the state has the primary responsibility to address pollution. That's what the Clean Water Act says. So unlike the JD, where the agency, the Corps, has set up something that you can do to find out if you need to get a permit, here Congress set this up. The states are supposed to have control, but the EPA says, well, too bad, we don't like what you're doing, we're going to take it away from you. If Congress had intended that the state would have complete control, they would have said that and they would not have put the EPA and the Corps into the process. Your Honor, certainly Congress gave them limited authority, as this Court said, in Ford Motor Company. But they don't have carte blanche, and that's really our argument here, that they've gone way beyond the powers that Congress gave them. And why is it worse than Hawksville? Number one, you have a right to get that permit from the state that isn't going to be vetoed by the EPA for arbitrary and capricious reasons, which we say is what happened here. Two, you'll never get to review the objections to the DEQ permit. So the State Department of Environmental Quality, it wants to give you that Clean Water Act permit. The EPA says, nope, we're not going to be able to because of these reasons. Yes, Your Honor? I'm sorry. But it wasn't denied by the state. The DEQ wanted to give it the permit. EPA denied it. Its objections ended that permit. It's over. It is binding. The EPA decision is binding. That DEQ permit is dead. It's a dead parrot. It will never come back to life. They can never challenge what happened to that state. Did the DEQ deny it? The EPA denied the DEQ permit. The DEQ says to the EPA, we want to issue this permit, this Clean Water Act permit. And the EPA says, no, you can't. And these are the reasons. The reasons are not within their authority. Counsel, I'm sorry. Are you saying that – Yes, Your Honor. Let me just ask you this question. Once the EPA made its objections, the DEQ still had three options, correct? Yes, Your Honor. And they were grant, deny, or do nothing. In this case, the DEQ threw its hands up because they could never – if it granted the permit, the landowner would have nowhere to go because the EPA had made it clear it was not going to sign off on it. So they deny it. It then transfers. They threw their hands up because the reasons the EPA gave were improper under the statute. Yes, Your Honor. Okay. Did they have three options, grant, deny, or do nothing? Your Honor, they had the options, but ultimately once the EPA gives arbitrary and capricious objections, they really had no choice. But they could have said – they could have denied the permit, right? They could have said we're honoring the objections and we deny the permit. Right, and they didn't – Your Honor, respectfully, they didn't honor the objections. I'm sorry. What would have happened at that point? The landowner would be left having to challenge the EPA's authority, build the road, and look at fines of up to $75,000 a day, as Sackett tells us. That would be if the DEQ had been granted. If the DEQ grants a permit. What if the DEQ – I think Judge White is asking you, suppose the DEQ had denied the permit, just said flat out, we go no farther with this, we're denying the permit. Well, then you can pursue the DEQ. You can pursue the – you mean – what do you mean by that? You would follow up with the DEQ and find out what can we do to satisfy you. But, Your Honor, ultimately that's not what happened, and in this case the DEQ said we can't ever – we want to give you this permit. Why would they deny the permit that they wanted to give? But you're saying, I mean, would there have been an appeal? You could in the state system, Your Honor, not in the federal. Well, Judge White, do you have any further questions at this point? No, thank you. Thank you, counsel. The case will be submitted. Thank you, Your Honor. Clerk may call the next case.